

666 Old Country Road
Suite 700
Garden City, NY 11530

Admitted in New York and Massachusetts

LAW OFFICE OF
MARK E. GOIDELL

Office: 516-683-0001
Cell: 516-459-4068
Fax: 516-228-0383
mark@goidell.com
www.goidell.com

April 9, 2020

<u>Via ECF</u>
Hon. Sandra J. Feuerstein
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

Re:     *United States v. Carl Washington*
         Case No. 18-cr-430 (SFF)

Dear Judge Feuerstein,

      I am the attorney for Carl Washington, the defendant in the above-referenced matter, who suffers from asthma and has been designated as an individual with "high risk" vulnerability to the COVD-19 virus by the Bureau of Prisons, MDC-Brooklyn, where he is currently detained. The letter motion is respectfully submitted to request that Mr. Washington be released to home confinement.

      Mr. Washington is 42 years old, and his "high risk" status arises from his asthma, from which he has suffered from early childhood, his age, and the COVID-19 pandemic, which has placed people with moderate to severe asthma, such as Mr. Washington, at high risk of becoming extremely sick from the COVID-19 virus. Mr. Washington uses an Albuterol inhaler on a daily basis to help control his asthma, and he has been provided with an inhaler at MDC-Brooklyn since being detained. The vulnerability of people with asthma to extreme illness and death from COVID-19 is well documented.[1]

      Last week, the New England Journal of Medicine published an article discussing the increased vulnerabilities faced by jail populations to COVID-19. A copy of the April 2, 2010 article is annexed hereto as Exhibit A.

      Deaths in federal prisons from COVID-19 around the nation are increasing [2], including at least three at the "GEO-Queens" facility.[3]

---

[1] See, e.g., CDC guidance, found at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fasthma.html

[2] Press Releases, Federal Bureau of Prisons, https://www.bop.gov/resources/press_releases.jsp

[3] https://queenseagle.com/all/nyc-private-jail-covid19-queens-detention-facility

Mr. Washington is housed in Unit 51 in MDC-Brooklyn, where several individuals, inmates and staff, have tested positive for the COVID-19 virus. Mr. Washington and the entire unit are under quarantine. Mr. Washington is surrounded by quarantined inmates and it is merely a matter of time before he is likely to be infected. The lockdown conditions in the quarantine are drastic - other than for one thirty-minute period on Monday, Wednesday, and Friday, Mr. Washington is confined to his cell for the entire day.

Mr. Washington has not been tested to determine whether he is infected. According to the most recent report submitted by MDC-Brooklyn pursuant to Administrative Order No. 2020-14, dated April 7, 2010, **only seven inmates in the entire facility have ever been tested**. Currently, Mr. Washington is experiencing congestion in his chest and a cough. His temperature is taken every two days, and thankfully, he has not yet had a detectable fever. Despite these conditions, his close proximity to others who were infected, and his "high risk" vulnerability, he still has not been tested for the COVID-19 virus.

There is good reason to believe that the MDC is not sufficiently protecting inmates from each other and staff who are highly contagious. The meager testing being conducted by MDC-Brooklyn makes it impossible to identify infected inmates, effectively isolate them, and quarantine those with whom they had contact, resulting in increasing spread, and ultimately, death. In comparison, in New York state-run facilities in the region, there are 286 tested-positive inmates on Rikers Island,[4] where testing is more robust. Likewise, at Westchester County jail, 24 inmates and 60 staff have tested positive, and an additional 73 symptomatic people have taken tests and are awaiting results.[5] Across the BOP, even with frighteningly low levels of testing, tested-positive cases have risen 12,800% since March 20, 2020, from 2 confirmed cases among inmates and staff to 258.[6] Eight federal inmates have already died from COVID-19.[7] The 12,800% rate of increase inside BOP facilities far outpaces the 1,845% rate of increase across the United States, even with abysmally low testing.[8]

The COVID-19 pandemic and its consequences to Mr. Washington are "exceptional reasons" to justify release under 18 U.S.C. § 3145(c). Mr. Washington is now and has recently been susceptible to serious illness and potential death because of the current conditions. The current situation "present a unique combination of circumstances giving rise to [a] situation[] that [is] out of the ordinary. *United States v. DiSomma*, 951 F.2d 494, 497 (2d Cir. 1991).

I respectfully submit that the changed circumstances also greatly decrease the risk that Mr. Washington will present a danger to the community. Mr. Washington fears for his life

---

[4] Coronavirus Infection Rates as of April 3, 2020, The Legal Aid Society (Apr. 6, 2020), at https://www.legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/.
[5] United States v. Willie Sims, 19-CR-857 (NSR) (S.D.N.Y.) (letter filed Apr. 5, 2020).
[6] COVID-19 Tested Positive Cases, Federal Bureau of Prisons (Apr. 6, 2020), at https://www.bop.gov/coronavirus/index.jsp.
[7] Press Releases, Federal Bureau of Prisons (Apr. 6, 2020), at https://www.bop.gov/resources/press_releases.jsp.
[8] Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU), Johns Hopkins University (Apr. 7, 2020), at https://bit.ly/39PMV4c.

because of the COVID-19 pandemic, and his motivation to live far outweighs any potential motivation to engage in criminal activity. Any such conduct could be suicidal because of the substantial risk of illness outside of his residence if released, and the risk of returning to a virus-infected jail if rearrested.

If released, Mr. Washington would reside with his friend, Valencia Hoggard, at her residence at 386 Lincoln Avenue, Riverhead, New York, where Ms. Hoggard has continuously resided for the past twelve years. Ms. Hoggard is gainfully employed by Northwell in the medical billing department. Ms. Hoggard is aware of this application and consents to Mr. Washington residing there with her.

I propose that Mr. Washington be released upon the following bail conditions:

- $50,000 personal recognizance bond, signed remotely by Mr. Washington within five hours of his release, and co-signed by a financially responsible individual, signed remotely within twenty-four hours of release;
- home detention with location monitoring;
- surrender of travel documents and no new applications; and
- drug testing and treatment as directed by pretrial services.

The proposed financially responsible individual is a family friend, Derrick Miller, who resides at 131 Norfleet Lane, Medford, New York 11763. He has been employed with the same company, Time Shred Services, since 2001. He has no criminal history.

Courts from around the country, this district, and the Southern District have granted release to vulnerable defendants because of the increased risk to people such as Mr, Washington of serious illness or death. Two recent orders of release from the Southern District of New York, also involving serious criminal accusations with high mandatory minimums and asthmatic defendants, were issued in *United States v. Lopez*, Case No. 19-cr-116 (KMW) (JLC) (order dated April 6, 2020) and *United States v. Padin*, Case No. 20-cr-135-5 (JMF) (order dated April 8, 2020). The orders are annexed hereto as Exhibits B and C, respectively.

As the result of the foregoing, it is respectfully requested that Mr. Washington be released from custody. Alternatively, it is respectfully requested that the Court conduct a hearing to determine whether the circumstances justify Mr. Washington's release.

Very truly yours,

s/ Mark E. Goidell

Mark E. Goidell

Encls.
cc:     AUSA Christopher Caffarone
        (Via email and ECF)

EXHIBIT A

*The* NEW ENGLAND JOURNAL *of* MEDICINE

# Perspective

# Flattening the Curve for Incarcerated Populations — Covid-19 in Jails and Prisons

Matthew J. Akiyama, M.D., Anne C. Spaulding, M.D., and Josiah D. Rich, M.D.

Because of policies of mass incarceration over the past four decades, the United States has incarcerated more people than any other country on Earth. As of the end of 2016, there were nearly 2.2 million people in U.S. prisons and jails.[1] People entering jails are among the most vulnerable in our society, and during incarceration, that vulnerability is exacerbated by restricted movement, confined spaces, and limited medical care. People caught up in the U.S. justice system have already been affected by the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), and improved preparation is essential to minimizing the impact of this pandemic on incarcerated persons, correctional staff, and surrounding communities.

Populations involved with the criminal justice system have an increased prevalence of infectious diseases such as HIV and hepatitis C virus (HCV) infections and tuberculosis. Disparities in social determinants of health affecting groups that are disproportionately likely to be incarcerated — racial minorities, persons who are unstably housed, persons with substance use disorders or mental illness — lead to greater concentrations of these illnesses in incarcerated populations. Yet implementation of interventions to address these conditions is often challenging in correctional settings owing to resource limitations and policy constraints. Therefore, comprehensive responses that straddle correctional facilities and the community often need to be devised.

For example, HCV, which is the most prevalent infectious disease in incarcerated populations, is most commonly spread through injection drug use. Transmission can be reduced using measures known to reduce high-risk behaviors, such as opioid agonist therapy and syringe exchange. Although much of the country has yet to implement these strategies in correctional settings, managing transitions in care to and from the community and providing such services to people after incarceration has a large impact. Similarly, we have learned that controlling infections such as HIV and HCV in correctional settings can have positive effects both in these settings and on surrounding communities, as a form of treatment as prevention.

Highly transmissible novel respiratory pathogens pose a new challenge for incarcerated populations because of the ease with which they spread in congregate settings. Perhaps most relevant to the Covid-19 pandemic, the 2009 H1N1 influenza pandemic

The New England Journal of Medicine
Downloaded from nejm.org by Miranda von Dornum on April 2, 2020. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

exposed the failure to include jails in planning efforts. By the spring of 2010, vaccine was plentiful, yet most small jails never received vaccine, despite the presence of high-risk persons, such as pregnant women, and the increased risk of transmission among unvaccinated persons who spent time detained in close proximity to one another.[2]

"Social distancing" is a strategy for reducing transmission and "flattening the curve" of cases entering the health care system. Although correctional facilities face risks similar to those of community health care systems, social distancing is extremely challenging in these settings. Furthermore, half of all incarcerated persons have at least one chronic disease,[3] and according to the U.S. Department of Justice, 81,600 are over the age of 60, factors that increase the risk of poor outcomes of infection. With limited ability to protect themselves and others by self-isolating, hundreds of thousands of susceptible people are at heightened risk for severe illness.

To date, the Federal Bureau of Prisons and certain states and municipalities have opted to suspend visitation by community members, limit visits by legal representatives, and reduce facility transfers for incarcerated persons. To reduce social isolation and maintain a degree of connectedness for incarcerated people, some correctional systems are providing teleconferencing services for personal and legal visits. Irrespective of these interventions, infected persons — including staff members — will continue to enter correctional settings. By March 14, some U.S. correctional staff members had tested positive for SARS-CoV-2, and the first Covid-19 diagnosis in a detained person was announced on March 16. A recent SARS-CoV-2 outbreak among cruise-ship passengers and crew in Yokohama, Japan, provides a warning about what could soon happen in correctional settings.[4]

To operationalize a response for incarcerated populations, three levels of preparedness need to be addressed: the virus should be delayed as much as possible from entering correctional settings; if it is already in circulation, it should be controlled; and jails and prisons should prepare to deal with a high burden of disease. The better the mitigation job done by legal, public health, and correctional health partnerships, the lighter the burden correctional facilities and their surrounding communities will bear. We have learned from other epidemics, such as the 1918 influenza pandemic, that nonpharmaceutical interventions are effective, but they have the greatest impact when implemented early.[5]

Therefore, we believe that we need to prepare now, by "decarcerating," or releasing, as many people as possible, focusing on those who are least likely to commit additional crimes, but also on the elderly and infirm; urging police and courts to immediately suspend arresting and sentencing people, as much as possible, for low-level crimes and misdemeanors; isolating and separating incarcerated persons who are infected and those who are under investigation for possible infection from the general prison population; hospitalizing those who are seriously ill; and identifying correctional staff and health care providers who became infected early and have recovered, who can help with custodial and care efforts once they have been cleared, since they may have some degree of immunity and severe staff shortages are likely.

All these interventions will help to flatten the curve of Covid-19 cases among incarcerated populations and limit the impact of transmission both inside correctional facilities and in the community after incarcerated people are released. Such measures will also reduce the burden on the correctional system in terms of stabilizing and transferring critically ill patients, as well as the burden on the community health care system to which such patients will be sent. Each person needlessly infected in a correctional setting who develops severe illness will be one too many.

Beyond federal, state, and local action, we need to consider the impact of correctional facilities in the global context. The boundaries between communities and correctional institutions are porous, as are the borders between countries in the age of mass human travel. Despite security at nearly every nation's border, Covid-19 has appeared in practically all countries. We can't expect to find sturdier barriers between correctional institutions and their surrounding communities in any affected country. Thus far, we have witnessed a spectrum of epidemic responses from various countries when it comes to correctional institutions. Iran, for example, orchestrated the controlled release of more than 70,000 prisoners, which may help "bend the curve" of the Iranian epidemic. Conversely, failure to calm incarcerated populations in Italy led to widespread rioting in Italian prisons. Reports have also emerged of in-

The New England Journal of Medicine
Downloaded from nejm.org by Miranda von Dornum on April 2, 2020. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

carceration of exposed persons for violating quarantine, a practice that will exacerbate the very problem we are trying to mitigate. To respond to this global crisis, we need to consider prisons and jails as reservoirs that could lead to epidemic resurgence if the epidemic is not adequately addressed in these facilities everywhere.

As with general epidemic preparedness, the Covid-19 pandemic will teach us valuable lessons for preparedness in correctional settings. It will also invariably highlight the injustice and inequality in the United States that are magnified in the criminal justice system. As U.S. criminal justice reform continues to unfold, emerging communicable diseases and our ability to combat them need to be taken into account. To promote public health,

we believe that efforts to decarcerate, which are already under way in some jurisdictions, need to be scaled up; and associated reductions of incarcerated populations should be sustained. The interrelation of correctional-system health and public health is a reality not only in the United States but around the world.

*Disclosure forms provided by the authors are available at NEJM.org.*

From the Department of Medicine, Divisions of General Internal Medicine and Infectious Diseases, Albert Einstein College of Medicine and Montefiore Medical Center, Bronx, NY (M.J.A.); the Department of Epidemiology, Rollins School of Public Health, Emory University, Atlanta (A.C.S.); and the Departments of Medicine and Epidemiology, Division of Infectious Diseases, Brown University and the Miriam Hospital, Providence, RI (J.D.R.).

This article was published on April 2, 2020, at NEJM.org.

**1.** Kaeble D, Cowhig M. Correctional populations in the United States, 2016. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, April 2018 (https://www.bjs.gov/content/pub/pdf/cpus16.pdf).
**2.** Lee AS, Berendes DM, Seib K, et al. Distribution of A(H1N1)pdm09 influenza vaccine: need for greater consideration of smaller jails. J Correct Health Care 2014;20:228-39.
**3.** Maruschak LM, Berzofsky M, Unangst J. Medical problems of state and federal prisoners and jail inmates, 2011–12. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics. February 2015 (https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf).
**4.** Kakimoto K, Kamiya H, Yamagishi T, Matsui T, Suzuki M, Wakita T. Initial investigation of transmission of COVID-19 among crew members during quarantine of a cruise ship — Yokohama, Japan, February 2020. MMWR Morb Mortal Wkly Rep 2020;69:312-3.
**5.** Hatchett RJ, Mecher CE, Lipsitch M. Public health interventions and epidemic intensity during the 1918 influenza pandemic. Proc Natl Acad Sci USA 2007;104:7582-7.

DOI: 10.1056/NEJMp2005687
*Copyright © 2020 Massachusetts Medical Society.*

The New England Journal of Medicine
Downloaded from nejm.org by Miranda von Dornum on April 2, 2020. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

EXHIBIT B

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  4/6/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,                      :
                                               :
                        Plaintiff,             :          **ORDER**
                                               :
        -v-                                     :          19-CR-116 (KMW) (JLC)
                                               :
                                               :
JOEL LOPEZ,                                     :
                                               :
                        Defendant.             :
------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

        This Order addresses an application by a defendant awaiting sentencing for

temporary release from custody in light of his heightened vulnerability to COVID-

19.  Defendant Joel Lopez is currently incarcerated at the Metropolitan Detention

Center ("MDC") in Brooklyn, where at least several inmates have been infected with

COVID-19 – although the exact number at the time of the issuance of this Order is

unclear.[1]  Lopez, who is 40 years old, suffers from asthma, and as such, it is not

disputed that he is more susceptible than others to potentially getting very sick, or

dying, from COVID-19.  On January 22, 2020, Lopez entered a guilty plea to a

narcotics conspiracy in violation of 21 U.S.C. secs. 846, 841(a)(1), and 841(b)(1)(C).

Docket No. 123.  Specifically, he pled guilty to "possess[ing] with the intent to sell

heroin, cocaine, and fentanyl," and admitted that there was "an understanding

---

[1] The Government reports that the latest information it has received is that only
two inmates at the MDC have tested positive to date.  Defense counsel reports that
five MDC staff members have tested positive as well.

1

[with others] that people would be selling these drugs." January 22 transcript at 12-13. His sentencing is not yet scheduled. He has been detained on consent since his arrest in 2019.

Given the nature of the charges to which Lopez pled guilty, his incarceration became effectively mandatory under 18 U.S.C. sec. 3143(a)(2). On March 26, 2020, the Court received a letter-application from defense counsel seeking an order, due to the discovery of COVID-19 at the MDC, granting Lopez temporary release on a number of conditions, including a $500,000 bond to be co-signed by five financially responsible persons and secured by the residence of one of the co-signers, home detention with electronic monitoring, and other conditions. Docket No. 153. As legal authority, defense counsel relies on 18 U.S.C. sec. 3145(c), which makes a limited exception to mandatory detention where, *inter alia*, "exceptional reasons" so justify.

On April 4, 2020, the Government submitted a letter opposing the request. The Government principally argues that the Court should deny defendant's application because Lopez's offense conduct is serious and because the Government believes that the MDC remains equipped to protect Lopez from exposure to COVID-19. Defense counsel submitted a reply letter on April 5, 2020. The Honorable Kimba M. Wood, the district judge to whom this case is assigned, has referred this application to Magistrate's Court. Given the existence of the COVID-19 pandemic, a hearing was held today by telephone with the defendant having waived his

appearance (Dkt. No. 163).  For the reasons that follow, the Court grants Lopez's request to be temporarily released pending sentencing.

Section 3145(c) of Title 18 creates a narrow exception to mandatory pretrial detention under 18 U.S.C. sec. 3143(a)(2).  It provides, in relevant part, that: "A person subject to detention pursuant to sec. 3143(a)(2) . . . and who meets the conditions of release set forth in sec. 3143(a)(1) . . . may be ordered released, under appropriate conditions, . . . if it is clearly shown that there are *exceptional reasons* why such person's detention would not be appropriate."  18. U.S.C. sec. 3145(c) (emphasis added).  The conditions of release set forth in sec. 3143(a)(1) require a finding by the court "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community."  18 U.S.C. sec. 3143(a)(1).  "[E]xceptional reasons" permitting the release of a defendant subject to mandatory detention are those that "present a unique combination of circumstances giving rise to situations that are out of the ordinary."  *United States v. DiSomma*, 951 F.2d 494, 497 (2d Cir. 1991).  Other judges in this District have recognized that the heightened threat posed by COVID-19 to an inmate with a documented respiratory condition in a detention facility with multiple confirmed cases "present[s] a unique combination of circumstances," *DiSomma*, 951 F.2d at 497, justifying release under sec. 3145(c).  *See, e.g., United States v. McKenzie,* No. 18-CR-834 (PAE), 2020 WL 1503669, at *2-3 (Mar. 30, 2020) (granting bond pending sentencing, pursuant to section 3145(c), to defendant who had pleaded guilty to single count of assault with a deadly weapon and had previously been

released on bond); *United States v. Witter*, No. 19-CR-568 (SHS), Dkt. No. 40, at 2-3
(S.D.N.Y. Mar. 26, 2020) (granting bond pending sentencing, pursuant to section
3145(c), to defendant who had pleaded guilty to narcotics conspiracy).  Of course,
the determination whether a given circumstance presents "exceptional reasons"
under section 3145 requires a "case-by-case" evaluation by the court, and the court's
discretion is "constrained only by the language of the statute: 'exceptional reasons.'"
*DiSomma*, 951 F.2d at 497.

Lopez argues that in light of the COVID-19 pandemic and the fact that he
has preexisting conditions that heighten the risk of complications, exceptional
circumstances warrant his release pending sentencing.  Lopez chronicles his
medical history in his submission, which includes the following: (1) he is prescribed
an asthma pump; (2) his asthma has at times required hospital care; (3) he has had
episodes of asthmatic distress while at the MDC prior to the current virus outbreak;
(4) he had extensive surgery in 2013 as a result of a traumatic accident which
required a period of significant hospitalization, and the injuries stemming from the
accident included lung damage that further compromised his respiratory system;
and (5) he has twice been hospitalized since his incarceration due to acute kidney
failure.  *See* Defendant's March 26 Letter at 2 and Exhibits A-D.  The Government
contends that Lopez has not produced sufficient evidence that his health risks are
"substantial enough" to justify his release (without suggesting, in this fast-moving
situation, what would be sufficient), nor "is there any evidence that the risks to the

defendant if he remains in custody are less than the risks to the community if he is released."  Government Letter at 4.

On the record presented, the Court concludes that Lopez has established exceptional reasons warranting his release pending sentencing.  COVID-19 is an unprecedented public health crisis, as has been documented in many other decisions issued by other judges in this Court, and will not be repeated here.  *See, e.g., United States v. Stephens*, No. 15-CR-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020).  The Government does not dispute that this is an unprecedented health crisis, or that Lopez is a high-risk individual.  It simply believes that given the serious crime to which he has pled guilty, combined with its belief that Lopez will be just as safe on the inside than on the outside, the relief sought is unwarranted. The Court wishes it could have the same confidence as the Government.[2]  In the circumstances of this case, the Court believes that Lopez's risks while in custody as a result of his medical condition present a "unique combination of circumstances giving rise to [a] situation[] that [is] out of the ordinary."  *DiSomma*, 951 F.2d at 497; *see also United States v. Perez*, No. 19-CR-297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (granting bail application in light of "the unique confluence of serious health issues and other risk factors facing this defendant, . . . which place him at a substantially heightened risk of dangerous complications should he contract COVID-19").

---

[2] The Court notes the concerns raised by Dr. Jonathan Giftos about the conditions at the MDC in his affidavit submitted by the defendant as part of his application for bail.  *See* Defendant's March 26 Letter, Exhibit E.

In addition to determining that exceptional circumstances exist, the Court must also find that Lopez "meets the conditions of release set forth in section 3143(a)(1)."  18 U.S.C. sec. 3145(c).  Section 3143(a)(1), which provides for release or detention pending sentencing, requires that the Court find "clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released."

In this case, I conclude that there is clear and convincing evidence that Lopez is neither likely to flee nor poses a danger to the safety of others in the community. There is no evidence to suggest that Lopez is likely to flee, apart from the potential for a substantial sentence resulting from his conviction.  Indeed, it would be difficult in these times for Lopez to avail himself of transportation away from New York City, where in any event he is a lifelong resident with strong family ties.  *See United States v. Fellela*, No. 3:19-CR-79 (JAM), 2020 WL 1457877, at *1 (D. Conn. Mar. 20, 2020) ("Flight would be enormously more risky and complicated in light of the travel and commercial restrictions brought on by the COVID-19 virus.").[3] Separately, the Government has proffered no evidence to suggest that Lopez's conviction involved violent conduct, and the Government conceded as much at the bail hearing today.  Thus, on the present record, the Court finds that Lopez's release would not pose a danger to the community.

---

[3] To that end, the Court is mindful of the letters of support from his parents and child, as well as several friends, that were submitted in support of this application. *See* Defendant's Letter dated April, 5, 2020, Exhibit C.

The Court is aware of the serious crime to which Lopez has pled guilty and of his extensive criminal history, including the fact that he committed the present offense while out on supervised release.  In ordinary circumstances, Lopez would not be a likely candidate for bail, and at the time of his arrest Pretrial Services did, in fact, recommend that he be detained (to which he agreed).  But these are not ordinary circumstances.  Given the totality of the circumstances in this case, Lopez's application is granted, and he is to be temporarily released on the following conditions:

- $500,000 personal recognizance bond;

- The bond to be co-signed by five financially responsible persons;

- The bond also to be secured by the property owned by proposed co-signer Jose Fournier (which it is represented by defense counsel has equity of approximately $100,000);

- Defendant to reside with his common law spouse, Millie Travieso, and their daughter, as well as his mother;

- Home incarceration enforced by electronic monitoring to be arranged by pretrial services (defendant may not leave residence except for necessary medical services).  All other leave from the residence must be submitted through defense counsel for the Court's approval;

- Unless otherwise approved by the Court, the location monitoring equipment shall be installed no later than 14 days after release during which the defendant is ordered to self-quarantine;

- All mandatory conditions of release set forth in the standard "Order Setting Conditions of Release" form;

- No visitors to the residence except for family members and defense counsel;

- No contact with co-defendants under any circumstances;

- Travel restricted to the Southern and Eastern Districts of New York;

- Surrender of all passports and other travel documents and make no new applications;

- Pretrial supervision as directed;

- Drug testing and treatment as directed by pretrial services;

- No possession of any firearm, destructive device, or other weapon;

- No use or possession of any narcotic drug or controlled substance unless prescribed by a licensed medical professional; and

- Defendant to promptly inform pretrial services when any cohabitant of the residence, including himself, becomes symptomatic of any illness.

Lopez's release is to occur only upon the satisfaction of all of these conditions.

The Court finds these conditions, taken together, adequately protect the safety of the community and ensure Lopez's return for sentencing while minimizing the threat to his health.

The stakes will be very high were Lopez to violate these conditions, even in the slightest degree. Lopez's counsel is directed to provide Lopez a copy of this Order as soon as practicable and to advise him that he could face the additional

crime of bail jumping were he not to comply with the conditions set forth in this Order.

Because his release is tied to the threat of the COVID-19 pandemic, Lopez's release shall be reassessed every 60 days to determine whether the exceptional circumstances justifying his release have dissipated.  To that end, not later than **June 6, 2020**, the parties must submit a joint letter discussing whether extraordinary reasons compelling Lopez's release continue to exist.

 No longer than 72 hours following his release from the MDC, Lopez and his counsel, along with counsel for the Government and the assigned pretrial services officer, must appear for a teleconference with the Court to ensure that Lopez fully understands the conditions of his release.

**SO ORDERED.**

Dated:     New York, New York
           April 6, 2020

_____
JAMES L. COTT
United States Magistrate Judge

EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
UNITED STATES OF AMERICA                                          :
                                                                  :
                        -v-                                       :            20-CR-135-5 (JMF)
                                                                  :
JACOBB PADIN,                                                     :            ORDER
                                                                  :
                                    Defendant.                    :
                                                                  :
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        Defendant Jacobb Padin is a 25-year-old with asthma detained at the Essex County

Correctional Facility, awaiting trial on charges of racketeering conspiracy, narcotics conspiracy,

and possession and use of a firearm in aid of a narcotics conspiracy.  On March 26, 2020,

Defendant moved for temporary release on bail pursuant to 18 U.S.C. § 3142(i), which allows

for temporary pre-trial release for a "compelling reason."

        The motion is a close one in view of the nature of the charges and evidence of the

Defendant's interest in, and access to, firearms.  Nevertheless, upon review of the parties'

submissions, including supplemental medical records submitted by Defendant yesterday, the

Court GRANTS Defendant's motion and orders him temporarily released on bail.  In particular,

in light of the dire circumstances presented by COVID-19; Defendant's asthmatic condition,

which exposes him to heightened risk in the event that he contracts the disease; and his lack of

substantial criminal history, the Court finds, albeit narrowly so, that a "compelling reason"

justifies Defendant's "temporary release" to the "custody of" an "appropriate person."  *See* 18

U.S.C. § 3142(i).  Accordingly, the Court imposes the following bail conditions:

- $50,000 personal recognizance bond signed by Mr. Padin, who may affix his
  signature remotely within three hours of his release, and co-signed by two
  financially responsible persons, who may sign the bond remotely within one

business day of Mr. Padin's release;

- 24-hour home incarceration at Mr. Padin's mother's residence, subject to approval by Pre-Trial Services, and enforced by location monitoring technology to be determined by Pre-Trial Services. Mr. Padin may only leave his residence for necessary medical services. All other leave from the residence must be submitted through defense counsel for the Court's approval;

- No visitors to Mr. Padin's mother's residence except family members;

- Unless otherwise approved by the court, the location monitoring equipment shall be installed no later than fourteen days after release during which time Mr. Padin shall self-quarantine in his mother's residence;

- Ten days after his release, Mr. Padin shall call Pre-Trial Services to arrange for location monitoring equipment;

- If approved by Pre-Trial Services, Mr. Padin is permitted to self-install the location monitoring equipment selected by Pre-Trial Services under the direction and instruction of Pre-Trial Services;

- Mr. Padin must purchase or obtain an iPhone with FaceTime capabilities within two weeks of his release for remote/virtual monitoring by Pre-Trial Services;

- Mr. Padin shall comply with all other standard conditions of supervised release (e.g., shall not commit other crimes, possess a firearm, etc.);

- Mr. Padin shall surrender any personal travel documents not already in the possession of Pre-Trial Services and make no new applications for travel documents;

- Pre-Trial Services supervision as directed in the Southern District of New York;

- Mr. Padin must immediately disclose to Pre-Trial Services when any cohabitant of his mother's residence, including himself, becomes symptomatic of any illness, and must report at the direction of Pre-Trial Services.

The Government shall immediately make arrangements for Mr. Padin and the two financially responsible persons to sign the bond and for Mr. Padin to be released. Defense counsel shall promptly make arrangements, with the Government's cooperation, to transport Mr. Padin to his mother's residence.

**Defendant shall surrender to the U.S. Marshals at 500 Pearl Street by 2:00 p.m. on June 7, 2020, unless the Court finds prior to that date — pursuant to a letter motion filed by Defendant — that "compelling" reasons still exist to extend the Defendant's release.**

The Clerk of Court is directed to terminate ECF No. 53.

SO ORDERED.

Dated: April 8, 2020
     New York, New York

                                    JESSE M. FURMAN
                             United States District Judge